■ Wilkin, J.,
concurring. On the first day of July, 1913, the city of Cleveland adopted a charter for its government, under favor of Sections 3 and 7 of Article KVIII of the revised Constitution.
By the provisions of the charter the people of Cleveland have abolished nominations for city offices by party primary elections, have ordained that nominations for all elective offices shall be by petition, and have adopted for municipal elections the nonpartisan preferential ballot. The secretary of state and the attorney general question the power of the city to do either of these things. Therefore they advised the board of deputy state supervisors and inspectors of elections of Cuyahoga county to proceed as prescribed by the General Code with party primary elections for the nomination of candidates for the elective municipal offices of Cleveland, to print the names of candidates so nominated on the ballots under party designations and emblems, and to hold the election for municipal officers according to the general laws of the state.
The city sued out of the court of common pleas of Cuyahoga county a restraining order, which upon demurrer was made perpetual, and to this decree error is presented directly to this court.
*376 The question we have to considér is, whether the city of Cleveland is authorized by Article XVIII of the Constitution, known as the home-rule amendment, to adopt its own method of nominating and -electing its municipal officers, or must it nominate-and elect its city officers in the method prescribed by general law. In other words, may the electors of Cleveland, having adopted a special charter for the government of their city, nominate candidates for elective offices by petition alone and vote without distinction of party their first, second and other choices amongst such candidates for the respective offices, upon what is known as the nonpartisan, preferential ballot? Or must they have direct primary nominations of party candidates for such offices, arid each voter designate, as his first and only choice for each office, the name of one of the several candidates whose names appear on the so-called Australian ballot in parallel columns bearing the title and emblem of the respective political parties which present candidates for such office? In short, does the reformed Constitution of Ohio require free-charter cities to conduct their nominations and elections of municipal officers in the same general mode which the statutes of the. state define for state, county and non-charter municipal offices ? Or does the constitutional grant of all powers of local self-government to free-charter cities exclude from this grant of self-government the right of choosing their own method of nominating and selecting the local agerits and officers who shall administer the affairs of the municipal government?
*377 The controversy turns upon the construction of three sections of the recent amendments to the constitution, to-wit:
Article XVIII, Section 3. Municipalities shall have all the powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws. Section 7: Any municipality may frame and adopt * * * a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government.
Article V, Section 7. All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law, and provision shall be made by law for a preferential -vote for United States senator.
The first proposition on behalf of the state is that the city’s exercise of all power of local self-government is limited by the concluding clause of Section 3, viz: “as are not in conflict with general laws;” that the method of nominating and electing municipal officers, as defined in the provisions of the Cleveland charter, is another and a different method from that defined in the General Code; therefore these provisions do conflict with general laws, and are not included but expressly excluded from the grant.
On the part of the city the contention is that the limitation is upon “such local police, sanitary and other similar regulations, as are not in conflict with general laws.” Manifestly this is the correct grammatical interpretation, for “such” and “as” *378 are relative words, and by the laws of the language they require the limiting clause to be construed with the substantive word “regulations” to which they belong. That is to say, the regulations must be such as are not in conflict with general laws, but all the powers of local self-government other than police, sanitary and similar regulations are unlimited.
Counsel for the state shift from grammatical interpretation to logical construction upon the word “police.” . They say police power is one of the inherent powers of government, necessary to the existence of the state, which was not intended to be delegated to the municipality. The city admits the truth of this statement as to the general police power of the state. That power is and must be reserved to the state; but the police power here conferred on the city is the local police power. The election of municipal officers is purely an affair of local government. If the city is to govern itself, certainly it must be free to choose its own method: of selecting the city’s agents to perform the municipal functions, for the people of a city of .700,000 souls cannot act en masse; they must act by representation. If the representatives of the state in general assembly may prescribe the mode of selecting, the mayor and council of the city by party caucus, primary and ballot, and since the mayor, under the charter, appoints the city solicitor, city treasurer and all the heads of the other departments of government, and the council makes the local laws, then the city will soon be as completely under domination of party bosses and their pliant minions as politicians could wish.
*379 In this case we have a document promulgated by a popular assembly; its language is the language of the people, for the people. They expect it to be applied to the affairs of state as plain men understand it. If the instrument of the popular will is not thus expounded, the hope of the people will be disappointed; many a good man’s faith in our courts and our democratic institutions will be shaken. This is an evil to be avoided, worse than finding an incongruity, or even a contradiction, between a phrase in one part and a germane clause in another part. It were better to let the state hobble along, with a defective instrument till the defect can be repaired, than to impair the confidence of the people in our courts and our system of constitutional government. A plausible construction to harmonize conflicting parts, however honestly made, which disappoints the purpose of the people who confirmed and established the writing, will not minimize the disgust of sensible men nor palliate the wrong done to the public conscience. Let the flaw in the structure of the revision be conceded, if there is one (and there seems to be), but let the new device have free play according to the manifest will of the people. It will serve the state far better so, than if we ignore the good intentions of practical men and attempt to mend it by legal construction and conjecture, and thereby defeat its purpose even but slightly. If we but seem to substitute our wisdom for theirs, we may hurt the cause of good government rather than help it. Ex-President Judge Wm. H. Taft at the meeting of the American Bar Association three weeks ago, used these words: “It is nearly as *380 essential to give the appearance of' doing justice as it is' to do substantial justice * * * in' order: for the courts to achieve their highest usefulness * * * in securing tranquillity and voluntary acquiescence in the existing order.”
The question is, What did the people mean when they ordained home rule for cities? Their language is found in the third and seventh clauses-of Article XVIII:
“3. Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
“7. Any municipality may frame and adopt a charter * *' * and may, subject to the provisions of Section 3, exercise thereunder all powers'of local self-government.”
Counsel for the state say this means all powers not in conflict with general laws. Counsel for' the city say it means local police, sanitary and other regulations not in conflict with general laws.
If all powers of municipal self-government must be subject to general laws, then clearly cities do not have home rule; they have only such powers-of local self-government as the legislature of the' state allows to them, and cities of Ohio will still remain under the domination of the state legislature. Who does not know that this domination is the very thing that the people of Ohio intended to abolish? Then, to the mind of plain men, the conviction follows that the restriction upon home' rule by “general laws” is limited to “police; sanitary and other similar regulations.” This*
*381 .conclusion is in harmony with a common-sense rule of construction, that a limitation or proviso .in a grant shall not be interpreted so as to defeat •or destroy' the grant; it will be deemed to except from the grant only a part of the thing granted. •If the thing- granted be a power, then the reservation, proviso or restriction shall be interpreted as .excepting from its operation some particular mode -of exercising the power or as excluding some particular thing which would otherwise be within •the power.
■ In' this case, say couñsel for the state, the thing excepted is nomination and election of municipal officers. Counsel for the city say that subject does -not come within the category of “local police, sanitary and other similar regulations,” and hence not. within the exception. If from the grant of “all powers of self-government” the right of nonpartisan nominations, and whatever else the legislature may wish to deny, is excluded, then, as the supreme court of Minnesota say, “if this is the extent of the power conferred upon cities to make their own charters, the constitutional grant •is a mere form of words of no practical value.” Grant v. Berrisford, 94 Minn., 45, 48. In a later case the same court say: “The power to frame such charter * * * necessarily includes all subjects appropriate to the orderly conduct of municipal affairs.” Schigley v. City of Waseca, 106 Minn., 94, 100.
Confronted with this argument, counsel for the state filed a supplemental brief, taking refuge in Section 7 of Article V. Let us note, they leave the constitutional, sub-title “Municipal Corporations” *382 (’Article XVIII) and go to a different subject, “Elective Franchise” (Article V). They plant themselves upon the first clause of Section 7 of the latter article: “All nominations for elective state, district, county and municipal offices shall be made at direct primary elections or by petition as provided by law.”
They say that Section 7 of Article V modifies Section 7 of Article XVIII. They argue that this clause requires all charter cities to have the direct primary election which is prescribed by state law. Counsel for the city' retort that the phrase “as provided by law” refers to the proper law in vogue in the local jurisdiction; if the nomination be for charter city offices the municipal law (the charter) governs, but if the nomination be for county or state offices, then the law of the state governs, of course. That is to say, there may be two modes of nomination in the city, one provided by charter for offices created by charter, another provided by statute for offices controlled by the state. For this very reason, they say, the generic word “law” is used in this section, and not the specific term “general law,” as in Sections 3, 8, and 14 of Article XVIII, where it means statute law.
Now, here is a specific difference, and a logical reason assigned for it. If this be an adequate account of the cause of the difference, and no other sufficient cause be given, then it goes a long way towards refuting the state’s argument and forcibly tends to support the contention of the city. It is at least sufficient to give the city the benefit of the doubt; it puts upon the state the burden of *383 establishing a better reason. If the constitution-makers intended to use the word “law” in Article V as synonymous with statutory law, counsel for the state have not told us any reason why the definitive word “general” or “statutory” was not employed with it, as in Article XVIII.
It is true that in the original constitution, before the revision, the word “law” is employed in the specific sense of statutory law, but it is equally manifest that the revisers have discriminated between the generic and specific import of the word. It is also important to note that both instances of the use of the word in the passages here in question, occur in the amendments, not in the original document, so that we have the revisers’ use of the word to deal with. If they meant the word “law” to signify the general law, and to exclude the local law, it is a fair inference that they would have used the definite term “general law” in Article V as they did in Article XVIII.
Again: By the method of the logical analysis of the connotation of terms, the argument on behalf of the state runs upon another horn of the dilemma. The nominations required to be made “as provided by law’' are “for elective state, district, county and municipal offices.” If the word “law” is to be taken in its narrow sense of state law, why shall not “municipal” be taken in its narrow sense of state-governed municipal corporation? But it must be conceded that the revisers of our constitution have embodied in the revision a new signification of the word “municipal;” they have engrafted a new logical attribute upon the concept. In the old constitution the only notion symbolized *384 by the word was a local subdivision of the state endowed with limited political autonomy within certain definite branches of governmental functions —in short, a legal creature of restricted powers: (Title XII, General Codé.) The revision adds a new idea to the notion; the amendments have doubled the concept. The word now means a territorial organization of people' under a charter with unlimited powers of' self-government, and also, as formerly, such a body of people organized with restricted powers under general law. Now, if we must give “law” its old restricted force of general or statutory law in Section 7, Article V' then why not read “municipal” in its old restricted sensé of urban community governed by general law ? Counsel for the state have given us no reason why, and we have found none. So by their own logical interpretation, self-governed charter cities are excluded from the purview of Section 7, Article V.
■ However, we do not rest upon formal logical interpretation of a mere word. We have in mind the sage wisdom of Chief Justice Marshall: “In performing the delicate and important duty of construing clauses of the constitution of our country,' * * * it is proper to take a view of the literal meaning of the words to be expounded, of their connection with other words, and of the general objects to be accomplished * * * by the grant of power.” ' (Brown v. Maryland, 12 Wheat., 419, 437.) Also Judge Cooley: “A reasonable construction is what such an instrument demands and should receive; and the real question is, what the people meant, and not how meaningless *385 their words can be made by the application of arbitrary rules.” (Const. Lim., 7 ed., 95). And Rlackstone: “The most universal ’ and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the reason and spirit of it; or the cause which moved the legislator to enact it.” (1 Comm., 61.) And Ihering, the German jurist: “Methods which attempt forcibly to transmute jurisprudence into legal mathematics, are wholly wrong and founded in a misunderstanding of the nature of law. Law is what life, business, and a sense of right decree to be * * * The ideas of law must be sought in practical grounds. Logical intuition has not given being to a single one of them. Even legal dialectics, where it had to work out the consequence of principles and ideas, was really guided by the practical fitness of the results.” (4 Geist des Roemischen Rechts, 3 ed., pp. 311, 315.)
Candor, quickened by an amiable communion with our brethren on the bench who disagree with us, bids us confess that one circumstance troubles us. The first section of Article V ordains that “Every white male citizen * * * who shall have been a resident * * * such time as may be provided by law, shall have the qualifications of an elector.” . Clearly the italicized words refer to the statutory law of the state. That the learned men and sagacious lawyers who collaborated upon these amendments would use the same phrase, “as provided by law,” in a different sense when they penned Section 7, is very doubtful. That they made such an ambiguous use of the phrase consciously, is incredible. The most natural expía *386 nation of this equivocal use of the word “law” is that they did not observe that it has a more narrow signification in Section 1 than they intended by its use in Section 7 (if they so intended).
We must bear in mind that the men who wrote Section 7 one year ago had a different purpose in mind than the men had who wrote Section 1 sixty years ago, and that the people of Ohio who adopted Section 7 did not compare its phraseology with similar forms of expression in the old constitution, but contemplated Section 7 only as a separate amendment abolishing the old style of nominations, unrelated to Section 1 of the original document, which prescribes the qualifications of electors. Shall we cause their purpose to fail in regard to a still more remote subject, viz., direct popular government of municipalities, because imperfections of literary style and incongruities of expression appear in the document when the new parts are placed here and there amongst the old? Shall we practically nullify the biggest and most elaborate amendment, which the people have ordained by a vast majority, for the sake of what may be called unity , of design and precision of legal ideas?
We recall a canon of interpretation as laid down by Chief Justice Marshall: “The same words have not necessarily the same meaning attached to them when found in different parts of the same instrument; their'meaning is controlled by the context.” (Cherokee Nation v. Georgia, 5 Pet., 1, 19.) Again: “The intention of the instrument must prevail; this intention must be collected from its words; its words are to be understood in that *387 sense in which they are generally used by those for whom they are intended; its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers * * * .” (Ogden v. Saunders, 12 Wheat., 332).
Counsel for the state must go a step further. They must persuade us that Section 7, Article V, requires that nominations shall be by both methods, by primary election and by petition. They paraphrase the section thus: All nominations * * * shall be made as provided by law (statute law) at direct primary elections, or by petition, as the electors may choose. They contend that the lawmaking body cannot adopt either mode to the exclusion of the other; and so they argue that if the local law, the charter, prevails over municipal nominations, the charter must give voters the alternative of nominating by primary election or by petition, because this section of Article V is intended to guarantee to citizens of the state both modes of selecting candidates. This process of reasoning raises a doubt; it certainly does not resolve the doubt.
But the process is not a legitimate one. The primary rule of interpretation is thát the language is to have its ordinary and usual signification, if it be not absurd. The simplé common-sense meaning of the clause, “All nominations * * * shall be made at direct primary elections or by petition as provided by law,” is that nominations shall be restricted to these two modes, and the law may provide for one or the other. The phraseology of the section standing alone is not *388 ambiguous. Hence it does not require construction" with anything else. (Slingluff v. Weaver, 66 Ohio St., 621.)
■ Counsel are not content to paraphrase the clause thus': “at direct primary election or by petition, or both.” That would still allow the city to adopt either method; so counsel go the great length of reading “and” for “or.” We think this is a strained construction. We do not say it is unnatural, because it is suggested by a plausible reason. The thought is that the revisers of the constitution were aware of the tyranny of party machinery, and they provided that if the minority are not given fair treatment at the party primary, resort may be had to petitions to bring forward minority candidates. We cannot deny that some thought of this kind may have been in the minds of some members of the constitutional convention and of some electors who voted for this amendment. But we do not feel such a conviction that this was. the motive of it as to warrant us to depart from the direct, positive and customary signification of the language. We think every good purpose will be subserved by our interpretation according to the primary and natural import of the language. This gives to the state, and to the cities as well, party nominations at primary elections if the people want their ballots made that way. But, upon the people of a free-charter city, to whom the constitution in ample and positive terms has guaranteed the form and method of government they have chosen for themselves, we •will..hot enforce party nominations against their will. .....
*389 Now, the doubt which springs out of a contemplation of the two sections side by side, is a mere accident which never occurred to the minds of the men who drafted, nor of the men who adopted, these amendments. What they had in mind when providing for “Primary Elections” (which was the proposal title of Section' 7, Article V) was to dispense with nominations by conventions, party bosses and “slates.” The purpose of Section 7, Article XVIII (title “Home Rule”) was just as clearly to refer all power of municipal government directly to the people of the cities themselves, free from the domination and manipulation of the state legislature and lobby. This power includes the control of the method of selecting the agents of the municipal government, for if the legislature may prescribe to cities the choice of their municipal officers by the partisan primary method, the recent history of at least one city in Ohio shows that the boss of the dominant party in the city may not only control the city but the legislature. also.
Shall we resolve a latent ambiguity as to the extent of the powers of free-charter • municipal government, by bringing to our aid from Article V an obscure phrase more difficult to interpret than the disputed passage from Article XVIII? If we may use this method of construction by reference to the remote context, what do we gain? We make the home-rule amendment, upon which depends the natural evolution of our cities, the reform of municipal government and the prosperity of the'state, a rope of sand! Cui bono?
Let us examine the reason why we are urged to do this thing, The argument runs thus: Ours is *390 a representative government. If we would preserve it we must jealously safeguard the freedom of' the elective franchise. This is a function of popular government, essential to the purity of republican institutions and to the existence of the state. Therefore the state dares not, and the constitution does not intend to, delegate to municipalities any share of the sovereign power over elections.
•We grant the premise; it is true; but the conclusion does not follow. The reasoning rests upon a suppressed minor premise which is false. It is this: There cannot be' an imperium in imperio respecting so vital an organ of government as the system of elective franchise, even to the extent of allowing the people of municipal corporations to devise and adopt their own method of selecting their representatives to administer their urban government. If this be true, we marvel that the Fathers of the Republic who framed the federal plan of our national government did not see the danger.
We may marvel still more that the mechanism which they contrived of co-ordinated local sovereignties within a paramount sovereignty—the local and general blending their schemes of elections and each controlling its own—has run on safely for a century and a quarter.
The federal government secures to each elector in every state the free and fair exercise of his right of franchise as to federal elections, with federal arms if necessary; but as to elections for state officers the state is left to choose its own methods and to enfofce them by its own police patrol and *391 otherwise. If the people of Ohio have decreed a similar arrangement between their state government and the local municipal governments, we have no authority to thwart their will, if we had ever so grave a doubt of the wisdom of the plan. It is our duty to enforce it according to the purpose and spirit of it.
The conclusion to which we have come, is, we think, founded upon the stronger reasons; it is in harmony with the popular will which we confidently believe was intended to be expressed in the- amendment. And it has the support of the great majority of the highest courts of other states which have adopted similar constitutional provisions, whose decisions are cited in the briefs of counsel. Judgment of the lower court should be affirmed.